The second case this morning is actually a consolidated case. It's cases number 414-0276 and 414-0277 in re Adoption of L.S. Sherry B. Davidson for the appellant. We have David Cox for the appellee. James Brinkheader. Mr. Cox, you may proceed. Good morning. Good morning. First, Your Honor, I would like to clear up the record. I know the Court's well aware that I filed a motion to actually postpone oral argument today based on the birth of my first grandchild, and as nature and God would have it, that happened Friday morning, so it rendered my motion moot. I had spoken with Carla Bender, the clerk. I faxed a withdrawal yesterday, and I filed an original withdrawal this morning. I had informed Mr. Brinkheader on Friday, so I just want to make sure and show for the record, ironic since we're all here, that my motion is withdrawn. Okay, excellent. Thank you. I hope all is well. Everything's great. Good. Congratulations. I officially feel older. My name is David Cox, and I represent John and Jacqueline's share in these proceedings, and this is similar to a case the Court heard last year regarding a guardianship case that was before Judge Weber in Macon County. I'm honored to be here again to argue a case before this Court. This young lady has led a tragic life so far and certainly has relied on state authorities to intervene and people with good intentions to intervene and take care of her. I think if we look at the pivotal incident by way of background, her father is deceased, her mother was deceased as of January 2013 in an overdose. Her mother had a history of drug and alcohol issues. There were Piatt County proceedings in which the minor was removed from the home a number of occasions through the state's attorney in the Department of Children and Family Services. During that time, my clients, John and Jacqueline's share, filed a petition for contested adoption, which was rendered moot when the minor was returned to her mother's care before her mother's timely passing in January of 2013. Then upon the death of her mother, it's my understanding that the minor lives with her deceased mother for two days, the third week of January 2013, and then there are a sequence of events that lead to her being taken care of by former foster parents, Scott and Emily Davidson, which are the opposing petitioners in this case, and there she remains. Now, the standard of review I have pled in this case is that the decision of Judge Little is against the manifest weight of the evidence. I think the court can consider an alternative standard, and that is the ends of justice standard where the court looks at the situation and looks specifically at what the court thinks is fair and equitable and whether or not the trial court acted in a way that's fair and equitable. So under either standard, it will be our request that the court remand this to the trial court with specific instructions to retry the case and to consider the evidence of experts and scientific evidence before the court. Make no mistake, this court has a very significant opportunity here to strengthen the process of protecting children, and I will explain why prospectively. We do believe that the decision of Judge Little, who I think is an excellent judge, is against the manifest weight of the evidence and was an unfair decision for the following reasons. Obviously, Judge Little, as any court dealing with minors' issues, has to deal with what they believe or what it believes to be in the best interest of the minor, and we know that there are certain sources, authoritative sources in law, for what govern best interest in an adoption case. The Adoption Act sets out specific standards, as this court is well aware, specific criteria, and I would urge this court to consider that criteria number six, seven, and eight are most pertinent to this case, six being the mental and physical health of those involved in the case, seven being the family ties between the child and the applicant, and eight being the background, age, and living arrangements of the applicant, and perhaps the child in this case. But we know in a case in which the department is involved or should be involved, that there are federal, state laws and regulations that drive the department to consider certain factors like race, religion, blood relative, background in making these kinds of decisions, and of course the Illinois Supreme Court has provided guidance generally on what it believes to be in the best interest in these types of cases. So I don't think we're likely to have any dispute on what I have said between Mr. Brinkhotter's perspective and the case in mind up to this point. It is in evaluating whether or not Judge Little made a decision that's in the best interest of the minor that I think we draw some striking differences here, and I urge the court to address these types of deficiencies that not only can exist in this case but exist in others. The first deficiency in Judge Little's decision is I think that the judge failed to give expert testimony in this case the clear weight that I think it deserved, and I've never been involved in a case in my entire life that offers a more striking difference between expert testimony on one side of the case and the complete dearth of any such testimony, either refuting the experts on our side of the case or offering a different perspective. In terms of expert testimony, the court, based on the review of the record, I remember when we were here on the guardianship, Justice White had indicated that she had read the entire record, which would be another tremendous undertaking in this case. You have Dr. William Shear, who was a physician for NASA and physician for the Bubble Boy, who's been a physician for over 40 years, who was certified as an expert in medicine, pediatrics, and in child immune deficiency disorders. You have Dr. Oaks, who was an expert in Chicago, ironically often called upon by the Illinois Department of Children and Family Services to evaluate youth that are at risk and make an ultimate recommendation on what needs to be done in terms of further counseling and treatment and how the case should be handled. And Dr. Oaks was certified as an expert in, basically, child trauma and in pediatrics in general. And you have Jack Lunch here, who was one of the petitioners, who basically was certified based on her master's degree as an expert in these kinds of child issues. It was the testimony of over these two pediatricians, which have over 75 years of cumulative experience, 75 years, and their testimony was supported by academic literature from the Pediatrics Association that was introduced into the record. It was their testimony that, A, all children in circumstances in which no one would dispute this minor was in, in terms of the death of her mother, and not living through the removal and replacement in the home where there are drug and alcohol issues and other issues involved in the home, there is no such case in which this child or any such similarly placed child is not at risk. And therefore, since they are all at risk under these types of circumstances, Dr. Oaks testified, all children, and this was supported by the academic literature, need to be evaluated. There needs to be a baseline physical and psychological evaluation. And then, counsel, in terms of the relevance of that to the court's determination here, is it because that wasn't done, you believe that bears on the Davidson's ability or there being a better fit than your clients, or what is the relevance of the fact that no evaluation had been done? I think there needs to be, first of all, I think, I recognize that trial courts in any court have broad discretion in order to consider evidence and how to evaluate evidence and how to proceed. But here is a situation in which the trial court had substantial expertise sitting in the trial court at the same time. And the relevance is, if you have experts who offer irrefuted testimony that the minor needs to be evaluated, we need to find out what the issues are, it may pertain to placement, it may pertain to what she is going to need in terms of counseling, it may pertain to whether or not there is any medical follow-up that needs to occur. Here you have a trial court who had that expertise ready and available. And it was Dr. Oaks' position that the court shouldn't make any permanent decision until the court has this baseline information. Counsel, at any point did your clients file a written motion asking that the child be evaluated? I didn't believe we had the standing to do so since we weren't the guardians for the child. So you did not? We did not. Okay. And your experts that testified, they didn't have the opportunity to meet or speak with this child or observe this child, is that correct? They didn't, Your Honor. But I think what one would regularly find in medicine is that that's not infrequent. Regularly doctors consult with each other, sometimes across the world in this day and age of technology and information. They're presented with certain facts and situations and the doctor will offer a specialized or expert opinion on what should be done in terms of treatment in this case. Back to try to answer your question, Justice Harris, more specifically, I think if you look at, and I recognize it's not fully defined by the U.S. Supreme Court, but we cited Professor Tanfor's argument from Indiana University or his article citing some of the cases that the U.S. Supreme Court is going to deal with to start with this interplay or this issue of maintaining the court's broad discretion in deciding these types of cases, but at the same time, what we're seeing in terms of scientific information being available to the court, being available in terms of making a higher quality decision. If we look at precedent in the law, I was recently hired to handle somebody who needed to obtain a guardianship for an elderly person who was ill and could no longer make decisions for themselves. It's undoubted or undisputed in the record that we have to have a doctor's opinion that a person is suffering from an infirmity and a person is suffering to the extent that they can no longer handle decisions about their medical care or perhaps even their financial affairs. And only when we have that doctor's report can a trial court appoint a guardian to start representing that person and advocating for their affairs and handling their affairs. If we deal with a real estate case, how often do we have to have an appraisal or a bank record on any financial case where a court uses expert evidence, if you will, from other areas of the law in order to make a good decision on what the value of a property is, what the tax rate should be? If we deal with child support, we deal with tax returns and income pay stubs so that we can have specific information, would it not follow that if we're in what would be arguably a much more serious situation, trying to make a decision as this trial court was and what the best interests of this child were, what we're going to be, that this court used the best information available to it at the time, which would be medical information that could be offered by significantly experienced physicians. And at no time did Dr. Oaks say that the girl needed to be placed with my clients. He said the court doesn't have that information. The court needs to have an evaluation and a medical evaluation in order to determine what the best interests in this case. Your clients have... I'm sorry, go ahead. Dr. Oaks did believe that it would be traumatic to remove the child from the Davidsons, correct? Could be. And he also believed that it would be traumatic if they were to return to the mission field, as Ms. Davidson indicated they were likely to do in Romania, that any displacement of the child... What was their testimony that they were likely to do that?  That they were likely to do that, and that was their preference. Do you have a site and a record for that? It would be during the cross-examination. And I know she talked about she had been there before and their work in the church, but do you have a site and a record as to that specific statement? Right. As I talked, I'll look for something more specific. I know in our reply brief, Your Honor, we cited several factual aspects of testimony, and it may be that I've included her, so I'll try to look while I continue to evaluate.   Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Appreciate it. I'm very happy to address your questions. Or maybe I'll have it by the time I do a rebuttal. Either way is fine. This is a test case. I truly believe it to be so on whether or not this court can provide guidance to trial courts on what to do with scientific information. We see that the United States Supreme Court is at least recognizing that judges should make this ultimate decision that they're responsible to make with the best possible information available to them. How can we ignore in this case, it's not just a matter of theory to decide that the girl, the young lady here needed to be evaluated medically and psychologically. It's not just an assertion of counsel. These two physicians testified in this case that in all such cases it is necessary to determine what's in the best interest of the minor. How would we propose that when faced with that opportunity, when faced with two pediatricians who indicated there's a need and that they could identify someone in order to evaluate the process, Justice White, I think that gets to your first question, in that the testimony of Dr. Oaks specifically stated that the court should take this step before the court makes any further decisions. Dr. Shearer indicated that he would pay for it and Dr. Oaks and Dr. Shearer indicated that they could provide a recommendation as to somebody in the field that could perform this evaluation. Again, this points back to this not being theoretical. There were experts in the courtroom. I'm confused here. Was such a request made? At trial, Your Honor. We raised the issue during the guardianship trial in July of 2013, which of course doesn't have a direct bearing on this case, but that's when a lot of these issues first came out. And that request was made at the adoption trial. The adoption trial started in December 2013 and was completed in January of this year. And the assertion was that she needed one and that's why Dr. Shearer indicated he would pay for one and Dr. Oaks indicated that that should be the next step. Isn't that a little late in the game, though, because, I mean, the judge is there having to make the decision. Rule 215 provides the mechanism or the avenue for obtaining that evaluation. Your client's petition for adoption was being heard as well, so your clients were parties and so could have made the request, I would think, under 215. And either it could be a position of their choosing or 215 also allows the court to select an independent expert, but to make the request at the time of trial seems to be making it a little late. Counsel, are you referring to the point in the testimony when Dr. Oaks was saying that this evaluation needed to take place and I believe Judge Little interjected and said, I have no money for an evaluation and then your client said they would pay for it. Is that what you're referring to? Yes, Your Honor. That's what I'm referring to. Okay. I just wanted to make sure that it was clear. Okay. And yes, I suppose, I'm not trying to minimize the point at all. I suppose in theory the request could have been made prior to December 2013. I'm not sure given that it's clear that the Davidsons were not open to my clients having additional contact with the minor. You'll see a visitation proposal that basically, for the most part, barred any kind of reasonable open contact between my clients and their family and the minor who is related to them. You also see a situation in which the guardian ad litem did not open the investigation and address several of the points that my client felt were important to them. So I think given that we learned for the first time at trial that there had been no evaluation, that there had been no treatment, that the guardian ad litem was not going to step up and request the same. It was at that point in time that Dr. Scheer and my clients thought that it was important to make that request to the court. The alternative would be to appear during trial in December or January and forego the point altogether. I mean, the ultimate issue here is did the court have the possibility to have the best possible information available to it? And the court did have that opportunity. And we're here in August of 2014, and apparently that's not happened because it wasn't part of the court's order. I don't think the timing, with all due respect, is as important as the need to have that information. In 2014, with the advancements that have been made in medicine and in psychology and our insight into child's issues, the ultimate issue is what is the best information the Clearly, the court negated any consideration of those types of issues here. The court could have acted decisively by ordering the investigation. You're right. I remember Judge Little indicating, I don't have any funds on which to appoint somebody to do this. And that's why Dr. Scheer stated under oath, we'll accommodate it. We'll pay for it. So at that point in time, regardless of what had happened in the future, it's clear that Judge White had the opportunity to act decisively at that point and didn't do so, which we believe created an injustice, which is the fact that we're almost over a year and a half since the young lady was found in her home with the deceased mother, and that we still don't have information. I mean, the dearth of any responsive or counter-testimony from the other side. This is not a case where the judge had no scientific information available to it, nor any opportunity. This is not a case in which the judge had to choose between experts on both sides. We had substantial expertise on one side, stating that there's an issue, stating that there's a problem. In all frankness, Dr. Oaks did not become involved in the case until November. You look at these issues of whether or not we could have asked for an evaluation before then. It was when we were concerned that we needed somebody detached from the case and not just the petitioner's father, regardless of his expertise, to look at the case that we hired Dr. Oaks to evaluate the case about a month prior to trial and to ultimately testify to trial. So it was at that point, knowing that nothing had happened by the time we appeared in court and based on Dr. Oaks' recommendation on the fact that there is no such thing as a case in which a young lady such as this doesn't need such an evaluation, that we made that request at the next reasonable opportunity to do so, which was at trial. The alternative would have been to move to have such an evaluation. I see my time has finished. You'll have rebuttal. Very good. Thank you, sir. Thank you. And I will look for your side. Counsel, it's unnecessary. Don't worry about it. Thank you. May it please the Court. Counsel. I think the sensible way to try this case would have been to gather the evidence that you wanted to have presented to the trial court before the trial so that everything could be presented to the trial judge at the time of the hearings. What counsel is suggesting here is that in the midst of trial, that he presents people who testify that it would be beneficial for this child to be evaluated without having taken the step of getting that kind of evidence, marshalling that kind of evidence, so that it could be presented to the trial judge at the hearings. For counsel to come into the case at the time of trial and say, this is absolutely something that we need to have, these kinds of evaluations for this child, is far too late for the assertion that evaluations are necessary to do the trial judge any good. Had a pretrial motion for examination been made prior to trial, the court could have determined whether it was appropriate to do so. It could have arranged for the child to be evaluated. It could have determined who should pay for it. And the court would have then had everything Mr. Cox now wants the court to have had advantage of at the trial instead of having this request be made in mid-trial. Mr. Brinkhouder, and I have a sense of what your opponent would say to this in regards to the GAL in this case, but did the GAL ever express reservations to the court that no evaluation had been done or that there was something lacking in terms of the state of the evidence in advance of hearing on this? No, the GAL talked with the Davidsons, tried to talk with, I think that he talked to the Shears. It happened to be that this particular guardian ad litem was also familiar with this case in that he had been the guardian ad litem in the original guardianship and that had by and large had presented a very similar recommendation in the adoption case as he had in the time, as a result of the guardianship case. So I, and I don't know what the parameters of the guardian ad litem's obligations are. I think that's within the judgment of the guardian ad litem. Counsel makes complaints to the trial, to the appellate court that the guardian ad litem permitted malpractice, it was unqualified, et cetera, et cetera. But none of those concerns were raised at the time of the trial. I would like to address the court, call the court's attention to my second issue that I presented. And I really do think that there is no reason for this court to ignore the clear mandate of the statutes of our state for an out-of-state applicant for an adoption to comply with the law. Mr. and Mrs. Shear from California were not qualified to pursue an adoption in this case. They were not, they are not related to the trial. We presented an exhibit to none other than Dr. Shear at which he agreed that these parties from California were first cousins once removed or second cousins. They are unrelated to the child. As defined in the statute. As defined in the statute. And I can't think of anything that we can do with a definition presented by the legislature in a statute that's applicable to adoptions other than to give it effect and make it a requirement. So we take the point that they are not related and we find that because they are not related, they must satisfy the requirement of residency. They have never been a resident of the state of Illinois for six months or more prior to, and they are not operating through an agency. And we asked specifically the applicants, Mr. and Mrs. Shear, if they had been working through an agency and their response was no. They had not been acting through an agency. In addition, since they were not related to the child within the definition of the statute, they were required to present an investigation report meeting the requirements of the statute. They did not meet that requirement. They did not present an investigation report. They did not have their fingerprints and criminal backgrounds to present to the trial judge. And so the trial judge would have naturally been concerned about their lack of compliance with the requirement of the adoption statute that they have an investigation report. And lastly, and as importantly as anything, we have the Interstate Compact. And the Interstate Compact specifically says who it applies to and who it does not. And I will tell you that I have had a lot of experience with the Interstate Compact, and most notably when about 15, 20 years ago, I tried to get through an adoption of some cousins and I wasn't in compliance with the statute. And I got told in no uncertain terms that they would not approve it and that the adoption was illegal. And we had to go back and backtrack and try and get some way or another of getting this thing approved. And it ended up that people had to move back to Illinois in order to get it done. So what we have here is a requirement and a prohibition for the court to approve an adoption for Mr. and Mrs. Scheer without the approval of Interstate Compact. And since they are not related within the meaning of Interstate Compact, they were required to comply. And that means that you go to the receiving state authority. Mr. and Mrs. Scheer would have had to go to the state of California to fill out an application about this thick. You know what I'm talking about? Two inches of materials. They would have had to go to Mr. Cox would have had to go to Mary Donnelly over in the Illinois Department of Children and Family Services in charge of Interstate Compact, get her application, fill it out with all the health information, all the background information for Mr. and Mrs. Scheer, and then there would have had to have been a letter by the sending state and the receiving state that this is approved. And they did not do that because they chose to take the position that they are related to LLS. And they are not related, and they are to LLS, within the meaning of the adoption statute or within the meaning of Interstate Compact. Mr. and Mrs. Scheer were not qualified to adopt this child, so that left the trial judge with one choice. And that choice was to place the child with a close-knit family, people who are the salt of the earth, people that this child had known for a third of her life, people who attended church with her, people who had children in their family that Lola referred to as her brothers. There was a time in Lola's life, in LLS's life, when a very tragic thing happened to her. And what did she do? After weighing the options, a small child, less than 10 years old, she picked up the phone. She called Emily Davidson. My mommy won't wake up. She sought the intervention and assistance of one person that she could trust to take care of her. And it just so happened that that day, Scott happened to be home from school, and they jumped in the car, got a babysitter for the kids, and took the baby down to Charleston and sat in the police station to see if they could help. Mr. Cox makes a great deal about what the department did do or what they didn't do and so forth in this case. I suggest to the court that this case had nothing to do with the Illinois Department of Children and Family Services. This was a family decision in which Jim Schooler and his ex-wife Mary, who had been divorced from him for many, many years, and the surviving daughter, aunt of LLS, that they decided at the police station that the best thing was for this child to go with Emily and Scott. And I would suggest also that when we talk about Ms. Walter, she said, I felt that this was best, and I felt that even though I would like to take her, that it was best for her to go with them. This is a family decision, a responsible decision, and Judge Little made a responsible decision in granting the Davidson's petition for adoption. I suggest to the court that not only were the Shears unprepared and unfamiliar with this child, but they were not legally qualified to adopt her. We would ask the court to affirm the decisions of Judge Little. Thank you. Thank you, counsel. Rebuttal, please. Justice Turner, may I clarify? I have five minutes. Is that right, Mr. Clerk? I'll have to be very quick and highlight it. Yes. Okay. Thank you. Yes, yes. I don't want to get into a tennis match with Mr. Brinkodder on the number of factual assertions he made that are either inactive or not in the record, so I'll rely on the justices with the assistance of their clerks in reviewing the record for what it does say. In terms of Mr. Brinkodder's view of the definition of family, the statute does say first cousin, but it doesn't define the extent to which first cousin relationship is extended. If Mr. Brinkodder's argument were to be followed and my clients had to follow the interstate compact process, they would have to, as he indicated in his argument today, start the process with the Department of Children and Family Services. If you go on, even though the statute doesn't define the distinction between first cousin and second cousin, and make no mistake, it's irrefuted that my clients are first cousins once removed, which means they share a grandparent that's at a different generational level. That's the only basis for the distinction. If you look in my brief at the citations to the Department of Children and Family Services regulations for handling interstate compact, they specifically exempt first cousins once removed. So the agency responsible for doing what Mr. Brinkodder says we were supposed to do would not qualify us for interstate compact because their own regulations indicate that if you're first cousins once removed or even second cousins, a person doesn't have to be subjected to that process. So the trial court did make a correct decision on that process. By the way, Justice White, in terms of housecleaning, and I know you indicated it wasn't necessary, but I do want to point out that in our reply brief on page 7, I quote extensively from Ms. Davidson's testimony, volume 2, page 108, lines 8 through 11, volume 2, page 117, lines 3 through 14, and this is where she indicates that she's open to whatever God has in store for her family, including returning to the mission field. If you go on to page 8, that discussion continues. Obviously, this court is well prepared in terms of the briefs and the record, and we don't have time during oral argument to hit every single point that either counsel would like to hit. There are several additional issues that we've asked the court to consider. Her placement was not consistent with her religious background, her racial background, or the fact that my clients are blood relatives. So we urge the court to consider those issues strongly. That implicates, we believe, certain constitutional rights. It is clear the department was involved in this case. Through Webster Cantrell, with Lindsay Seitz, and through whoever this mysterious Helen is, in Charleston. Ever since the consent decree that I'm sure this court is aware of in 1991, in which the department was dictated to reduce the ratio between workers and number of cases that they have open, anyone who's practiced in this field, which I presume was probably everybody in the room, is aware that there's been a priority of DCFS not to open cases unless they have to. And I'm sure often that's followed in good faith, but in this case it wasn't. The family members, including Mr. Schulenberg, who had been divorced from the family for 39 years, did not have standing to step in and make decisions regarding the minor. Jennifer Wolter didn't even travel to Charleston to do so. She did it from her phone in Monticello, because she's ill. The department knew about the shears, they knew about their interest in the minor, and they knew about the circumstances. And they failed to act in terms of pursuing the possibility of placement with blood relatives. The Davidsons were foster parents. They had an obligation to hotline the case and to cooperate in consideration of placement of the minor with blood relatives. Yet they used the situation as a farm process for basically seeking an adoption of someone they had previously cared for. The GAL could have offered relief by providing a thorough investigation and did not. So for all these reasons, we respectfully request that this court consider the very low hurdle that not requiring trial courts to consider proper evidence would establish for other trial courts in terms of this decision were to be affirmed with where the hurdle should be, which is the highest possible practice in terms of consideration of the evidence that's available for the court or can be available for the court. Thank you for your time and attention. We respectfully request that the court reverse the trial. Thanks to both of you. The case is submitted and the court stands in recess.